WHEATLEY *v.* DRENNEN.

4-7724                                    189 S. W. 2d 926

Opinion delivered October 29, 1945.

*Murphy & Wood,* for appellant.

*Leo P. McLaughlin* and *Jay M. Rowland,* for appellee.

GRIFFIN SMITH, Chief Justice. The question is whether the obligation of a written contract to sell real property was discharged by substitution; and (a) if the answer is that it was not, what is payable to compensate damage?

On the 24th of June, 1944, Mrs. C. T. Drennen acknowledged in writing that she had received $500 "as a deposit and binder" on designated property, including furniture. The balance of $6,250 was payable when an examination of the abstract should show good title, at which time the deed was to be executed.

Mrs. Drennen had been away from Hot Springs for quite a while. Upon returning she was approached by H. A. Wheatley, who offered to buy the property in question—her residence. Wheatley called upon Mrs. Drennen and together they discussed the proposed purchase and sale. Mrs. Drennen's version of her discussion with Wheatley is in part shown in the footnote.[1]

Wheatley's visit occurred on Saturday. The following Monday Mrs. Drennen went into town and talked with some of her friends and became dissatisfied. When she met Wheatley on a street she tried to return the check, but he refused. She then went home and enclosed it with a letter, sent special delivery. That afternoon Wheatley called upon Mrs. Drennen, with the following results, as testified to by her:

---

[1] "I had been out of town for two years and a half and had been back about two weeks. Mr. Wheatley came to me and said, 'You want to sell that property?' I told him I did, and he said, 'I want to buy.' He asked me how much I would take and I said, 'Ten thousand dollars,' and he said, 'The man I want to buy it for won't give you $10,-000.00. I want to buy this property for somebody else and he won't give you $10,000.00.' He then said he would give me $7,000.00 and take out his commission. Then he said he would let $100.00 go off of that commission. That made it $6,750.00.

"After he had told me that the house was practically rotted and fallen down, and that the roof had to be fixed and the porch had to be fixed, and that the house had to be painted and decorations inside had to be done and everything, I thought my house was about to fall down, and I told him, I thought I ought not to consider that at all, but he insisted that the man was going to buy another piece of property if I didn't sell him this piece of property at this moment, and he gave me $500.00 in a check, and I gave him what I thought was a binder or option on that deal until I could consider the matter."

"We talked it over and talked it over; and finally, he said, 'Well, I will be willing to let you have the commission and give you $7,000.' We talked quite a bit about it, and as he went down the steps, he said, 'Mrs. Drennen, if you change your mind, let me know,' and I said, 'If you change your mind, Mr. Wheatley, let me know.' I then thought that the whole transaction was finished. It never occurred to me or any of my friends who were business men down the street that I had any contract. Except for Sunday, it wasn't six hours before I sent him back his money. It was just twelve hours before I sent him back his money."

About a month later, Mrs. Drennen, by separate warranty deeds, conveyed part of the property to Louie A. Brandon and the rest to Dr. and Mrs. J. C. Cheney, the considerations aggregating $10,000. Of this amount $7,-000 was paid in cash and three notes for $1,000 each, due one, two, and three years from date, were executed by Louie A. Brandon. Mrs. Drennen placed these notes with Arkansas Trust Company for collection—a fact disclosed by the Bank's answer as garnishee. Suit was brought by Wheatley praying (a) specific performance, and (b) that in the alternative he be awarded damages. Subsequent developments convinced the plaintiff that Mrs. Drennen's grantees were innocent purchasers and as to them there were dismissals. The Chancellor found that the writing signed by Mrs. Drennen satisfied the statute of frauds, and "created a valid and binding contract." Thus, inferentially, it was held that the contract was not fraudulently procured. There was the further finding, however, that Wheatley and Mrs. Drennen, in their subsequent negotiations and conversations, treated the first contract as having been discharged, emphasis being placed upon Wheatley's proposal to waive the so-called commission and to allow Mrs. Drennen to collect a month's rental, amounting to $100.

Since Mrs. Drennen has not appealed from the Chancellor's finding that the original contract was not vitiated by proof of the conduct she alleged, we do not consider her contentions that Wheatley, as a large owner of real

property, was in better position than she to know what the actual values were, and that she was imposed upon by his impetuous attitude and the persistent way in which he urged that the agreement be immediately consummated. Mrs. Drennen concedes that as between them there was no confidential status and that Wheatley did not occupy a fiduciary relationship.[2]

We think the conversations between Mrs. Drennen and Wheatley fall short of an agreement to rescind. Whatever Mrs. Drennen's construction may have been, the evidence discloses an entire want of mutuality. Wheatley, at most, only proposed to forego certain relatively minor advantages. The proposal to waive a commission and to permit Mrs. Drennen to collect a month's rental was obviously for the purpose of persuading her to abide the original contract, ameliorated by the concessions amounting to $350. Under any rational construction of the testimony—material portions of which are not in dispute—Wheatley at all times insisted that he had a binding contract, while Mrs. Drennen maintained that she did not understand the nature of the writing—believing, as she expressed it, that an option had been extended. Her own words were: "I didn't know what a 'binder' was. I thought I was taking it under consideration."

Whatever Mrs. Drennen's conception may have been in respect of the writing and its nature, she knew (before making deeds to others) how Wheatley regarded it; and, while her position as a woman without extensive experience, dealing with a man who knew real property and the ways of business, calls for close scrutiny of the transaction, legal effect must be given a writing that is unambiguous; nor are we at liberty, in circumstances such as those before us, to translate protests of the dis-

___

[2] Typical of Mrs. Drennen's reactions to Wheatley's representations is the following, taken from her testimony: Q. "You knew, as a matter of fact, that the house wasn't about to fall down, and [that it was not] in such terribly bad condition, didn't you?" A. "Well, I didn't believe all he said, but I thought some of it might be true." Q. "You stated in your testimony that he told you that your house was practically rotting down, and about to fall. You knew that was an extravagant statement, didn't you?" A. "Yes, just like polishing the face of the moon." [Mrs. Drennen had also testified that certain substantial repairs were to be made].

appointed signatory to a contract in such manner that relief may flow to one of the contracting parties at the expense of the other.

No rule is better established than that a contract cannot be rescinded except by mutual consent. *J. L. Metz Furniture Company* v. *Thane Lumber Company,* 298 Fed. 91. Abandonment, being generally a mixed question of law and fact, it follows that when the issue is whether a written contract has been abrogated by a subsequent oral agreement, it is necessary to show that it was the intention of all parties to the original contract to abandon it by entering into the subsequent oral agreement. *Vogler* v. *Dyer,* 149 Ark. 670, 234 S. W. 540. It was said in *Duty* v. *Keith,* 191 Ark. 575, 87 S. W. 2d 15, that to abrogate or modify a prior contract it was necessary that minds of the parties should have met by an offer and acceptance regarding the new terms.

Since mutuality was essential in order that Mrs. Drennen be relieved of her written obligations, result is that before she can be discharged it must have been shown that Wheatley not only intended to substitute the modified offer for the writing, (or carelessly misled Mrs. Drennen) but that his purpose was, in the event she refused the counter proposal, to abandon the transaction in its entirety. The evidence is not susceptible of this construction.

The decree is reversed, with directions that the trial court enter judgment for Wheatley for $3,000. It is conceded by appellant that no greater sum than the difference between his offer and the amount for which Mrs. Drennen sold can be collected. The Chancellor should further decree that the garnishee bank act as trustee in holding for collection the three $1,000 notes, and that from proceeds Wheatley be paid the net amount due him. It is so ordered.